**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF GEORGIA**
**VALDOSTA DIVISION**

| | | |
|---|---|---|
| **GRAYSON SMITH, *et al.*** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| **V.** | ) | **CASE NO: 7:24-cv-00083 (WLS)** |
| | ) | |
| **AUTO-OWNERS INS. CO.** | ) | |
| | ) | |
| **Defendant.** | ) | |

**PLAINTIFFS' BRIEF IN RESPONSE TO DEFENDANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT**

Plaintiffs GRAYSON SMITH AND SAVANNAH SMITH (collectively, the "Smiths") file this Brief in Response to the Motion for Partial Summary Judgment [Doc. 18] filed by AUTO-OWNERS INSURANCE COMPANY ("Auto-Owners").

## I. INTRODUCTION

When Hurricane Idalia hit Valdosta, Georgia, on August 30, 2023, the Smiths' residence at 2811 Pebblewood Drive (the "Property") was severely damaged by a falling hardwood tree. [Doc. 1-2, Complaint, ¶6, 26-29.] At the time, the Property was insured by Auto-Owners against storm damage pursuant to Policy Number 53-155-326-00 (the "Policy"). [Doc. 1-2, Complaint, ¶¶9, 12.] This case concerns the scope of insurance coverage due to the Smiths under their Policy, with the underlying question being whether the Smiths' home was "racked" – i.e., whether its walls were pushed out of square by the force of the tree impact and the hurricane force winds. The question itself is not genuinely debatable, as comprehensive, objective measurements taken by an engineer firmly establish the existence of racking. [Doc. 19-2.] That question remains before the Court, not because Auto-Owners can make a credible argument against it, but because Auto-Owners staked out its coverage position in the earliest stages of the claim; in doing so, it failed to recognize that the home had been racked; and, at all times since, Auto-Owners has steadfastly refused to give good faith consideration

to this issue. At present, the Court is being asked whether there is evidence that Auto-Owners' coverage refusal was made in bad faith. As will be shown, that is not a close question either, and it is one that Georgia law requires to be submitted to a jury.

Auto-Owners' efforts to determine the scope of the Smiths' property damage consisted of three site visits: one by its claim adjustors, one by a third-party cost estimator, and one by an engineer. All three visits took place within three weeks of the loss. Racking first became a known issue in the claim a few days after Auto-Owners' last site inspection, on September 26, 2023, when the Smiths submitted a report from Crews Engineering [Doc. 19-2](the "Crews Report") stating that the tree's impact and the exposure to hurricane-force winds had pushed the house out of plumb. Neither Auto-Owners nor its consultants returned to the Property after receipt of the Crews Report, which means that Auto-Owners never set foot on the Property *after* the central issue of this case was raised.

Auto-Owners' consideration of the Crews Report consisted solely of forwarding it to its own engineer, Brent Boyd of Trinity Engineering. Effectively, Auto-Owners asked Mr. Crews to determine for himself whether he had missed something important during his inspection. Mr. Boyd spent two hours considering and responding to the Crews Report. He did not return to the Property, nor did he contact Crews Engineering. His response, dated November 3, 2023 [Doc. 19-7] states that, during his inspection, he had observed only "minor shifting" to the home's walls and that the shifting was "localized" to the "main area of impact." He did not define "minor shifting" nor did he identify any measures taken by him to exclude the possibility of shifting in other areas. He did identify any methodological or other errors within the Crews Report. He merely stated that it did not "conclusively show any additional damage" that he had not observed himself. Based on this letter, Auto-Owners deemed the issue resolved, and it has refused to revisit it in any meaningful way at any time since.

It is unreasonable that Auto-Owners would accept Mr. Boyd's letter as the final word. For one, he admits there was shifting of the walls, and his report identifies at least one such instance in a room

remote from the tree impact. [Doc. 19-3, p.71-72.] It also states that "[s]ome additional door frames adjacent to the main areas of impact were noted with minor shifting." [Id. p.3.] His terminology (for e.g., "main area" and "minor") is vague and lacking in the precision one would expect from rigorous engineering analysis. He spent only 90 minutes on site, and only two hours reading and rebutting the Crews Report. Moreover, the devastation at the Property was massive, as was the size of the tree that caused it. Any reasonable person who saw the damage and who read the Crews Report would have readily recognized this issue as requiring further attention.

Only one person at Auto-Owners read their own engineer's report. No one ever met with or spoke to their engineer, nor did anyone communicate questions or concerns to him in writing. Before blindly accepting his opinions, Auto-Owners never inquired about its engineer's background, and, consequently, Auto-Owners was unaware that he had been a licensed engineer for less than four years and that his professional work is limited to inspecting roofs damaged by wind and hale. [Doc. 19, p.3-4.] Auto-Owners never consulted with a second engineer, and it never met with, spoke to, or otherwise communicated with Crews Engineering about its findings. Auto-Owners claims to have relied on the opinions of its third party cost estimator on the issue of racking, but, as will be shown, that is not just untrue but entirely discrediting, as that person actually agrees that the house is out of plumb.

Some months after Auto-Owners had denied coverage for racking, the Smiths engaged a second engineering firm, Quest Engineering, to independently review the issue and obtain further measurements. The resulting report [Doc. 19-6](the "Quest Report") contains detailed measurements, photographs, and written opinions conclusively establishing the existence of racking. It was sent to Auto-Owners in an effort to break the parties' impasse [Doc. 1-2, Ex. P], but Auto-Owners did nothing in response. This is not an exaggeration – it is an admission. [Doc. 28, Brumer Depo. 38:18-21; Doc. 34, 30(b)(6) 57:13-58:3.] Such rote, inattentive consideration of a crucial issue is the epitome of bad faith. For that reason and the others set forth below, Auto-Owner's motion should be denied.

## II. ARGUMENT AND CITATION OF AUTHORITY

### A. LEGAL STANDARD APPLICABLE TO BAD FAITH.

Pursuant to O.C.G.A. § 33-4-6, an insurer is subject to penalties and attorney's fees if it refuses to pay a covered loss in bad faith. Where a careful scrutiny of the evidence indicates that an insurer does not have a reasonable defense vindicating its good faith, bad faith penalties are authorized. Cincinnati Ins. Co. v. Kastner, 233 Ga. App. 594, 596 (1998). This is ordinarily a question for determination by a jury. *See* Blue Ridge Ins. Co. v. Maddox, 185 Ga. App. 153, 153 (1987)( "(T)he existence, or not, of bad faith is a jury question."); Great Sw. Exp. Co. v. Great Am. Ins. Co. of New York, 292 Ga. App. 757, 761 (2008). ("Rather, the question of good or bad faith of the insurer is ordinarily for the jury.") O.C.G.A. § 33-4-6(a) expressly states that summary judgment may not be granted to an insured on the sole basis that it relied on "the testimony or opinion of an expert witness." *See* Perry v. Encompass Ins. Co. of Am., No. 1:20-CV-1222-SCJ, 2021 WL 6926686, at *2 (N.D. Ga. Nov. 23, 2021); First United Pentecostal Church v. Guideone Specialty Mut. Ins. Co., No. CV 104-008, 2004 WL 5565011, at *2 (S.D. Ga. Aug. 20, 2004)

### B. HISTORY AND SUBSTANTIVE EVIDENCE OF AUTO-OWNERS' BAD FAITH.

On September 4, 2023, Auto-Owners' claims adjustor Tim Brumer and his supervisor Dan Waller spent between two and five hours at the property. [Brumer Depo., 10:1-13; Doc. 37, Waller Depo., 15:1-11; 16:15-16.] Mr. Brumer was the person primarily responsible for this claim, and the person who made the ultimate coverage decision for Auto-Owners. [30(b)(6) 84:13-85:3.] Mr. Brumer testified: "I'm not a trained engineer, and I'm not a trained construction worker. I don't have a background in either area. [Brumer Depo. 7:21-23.] He testified that, prior to this claim, he had only heard the term racking once, in connection with a colleague's claim, not his own. Other than looking "racking" up in a dictionary, he made no effort to educate himself about it. [Id. 54:9-55:15.] Mr. Waller worked for a construction company from 2006 to 2011, as an estimator and general manager,

not a builder. He holds a roof inspection certificate obtained from a 5-day course. Other than that, he lacks any construction or engineering training or experience. [Waller Depo. 8:15-10:10.] Mr. Waller testified that he "does not quite understand" what is meant by the term racking. [Id. 21:18-23.]

In its Brief, Auto-Owners states that, during that site visit, "Brumer confirmed **some** covered storm damage to the Property." [Doc. 18-1, p.2] By "some," Auto-Owners actually means that Mr. Brumer confirmed extensive damage, as the following file entry shows:

> Trees penetrated roof in at least 6 areas damaging roof surface, decking, and rafters. Tree hit family room off of kitchen area damaging all windows, stucco, and wall framing. Over 70% of chimney and flue knocked down. Water and tree damage to kitchen, family room off kitchen, water damage and drywall damage to master bedroom, hallway, entry way, dining room and family room. Tree penetration into bedroom upstairs. High moisture levels in all walls. Ceiling in kitchen collapsed. Damage to kitchen appliances from water. Damage to personal property in all areas. Trees cut from house prior to inspection. Roof has severe damage to 3 of 4 slopes requiring COMPLETE roof replacement. [Exhibit C, p. 36.]

Despite this documentation, Auto-Owners claims that the "damage was largely isolated to the rear elevations and the areas directly beneath and adjacent to the location of the tree impact, as well as some limited damage in other areas of the house due to limb impact in those areas." [Doc. 18-1, p.2.] This characterization is not at all reflective of what Mr. Brumer actually documented, nor can it be reconciled with the actual scope of loss, as reflected in the below pictures [Doc. 1-2, ¶26, 29]:









Auto-Owners' has consistently sought to downplay the scale of the Smiths' storm damage in this litigation. For instance, it flatly denied Paragraph 26 of the Complaint, which contains two of the above photographs and states that "[t]he impact from the falling tree caused catastrophic damage to the dwelling." [Doc. 1-2.] Auto-Owners' 30(b)(6) designee, when shown the photographs and questioned about that denial, testified "I'm not sure that I would call that necessarily catastrophic in nature just from the pictures." [27:10-11.] This is hard to digest. After all, even while excluding any coverage for racking, Auto-Owners itself estimated the Smith's house damage at $320,091.13. [Doc. 18-1, p.16.] A number that size is catastrophic to almost anybody, and Auto-Owner's campaign to downplay the Smiths' loss is not only discrediting but a clear reflection of the obstinacy and lack of forthrightness with which it has adjusted this claim.[1]

The second site visit occurred on September 13, 2023, when Keith O'Donnell of JS Held visited the Property on Auto-Owner's behalf. He was tasked with generating a cost estimate. Mr. O'Donnell is not an engineer and has not completed post-secondary education of any kind. [Doc. 31,

[1] In that same vein, Auto-Owners' Answer [Doc. 1-3, ¶30] denies knowledge of whether Valdosta was exposed to extraordinarily high winds during Hurricane Idalia. When asked about this, its 30(b)(6) designee professed total ignorance: "I don't know what the wind speeds were. Were they gusts? Were they straight-line winds constantly? So during that time, I don't know what the winds would've been." [35:17-19.]

O'Donnell Depo. 7:25-8:7.] He has never done any kind of coursework or continuing education related to engineering generally or the issue of racking specifically, nor has he ever read any books related to racking. [Id. 67:521.] Mr. O'Donnell measured the dimensions of different rooms, created sketches of the house, took numerous photographs, and used a computer software called Xactimate to generate an estimate of the cost to repair the house. [Id. 24:24-28:24.] The end result was a report in the form of a spreadsheet dated September 27, 2023. [Exhibit A.] It contains no narrative analysis, and no structural opinions.

The third, and final, visit occurred on September 19, 2023, when Brent A. Boyd, PE, with Trinity Engineering, inspected the Smiths' house. Mr. Boyd spent "about 90 minutes" on site [Doc. 36, Boyd Depo. 19:6-9], later issuing a written report (the "Trinity Report") [Doc. 19-3]. The many deficiencies in Mr. Boyd's methods and conclusions are addressed in Plaintiffs' *Daubert* Motion [Doc. 19]. To avoid duplication, those arguments are incorporated by reference. It is worth noting, however, that Mr. Boyd was retained, not because Auto-Owners had vetted his experience and education, but because he could travel to Valdosta the soonest. [30(b)(6) 77:21-78:11.] Auto-Owners made no effort of any kind to examine or ascertain Mr. Boyd's training or experience:

> Q. And did you interview anyone at Trinity, speak to them to make yourself comfortable that this was the right firm or the right person for the job?
> A. I did not interview anyone at Trinity. I never interview anyone for an engineer visit.
> Q. Did you do a review of the credentials of Trinity as a firm or of the engineer who was going to be handling this specific claim?
> A. No. [Brumer Depo. 19:4-12.]

*See also* Waller Depo 27:11-19: "I don't know who Brent Boyd is"; "Do you know anything about his qualifications?" "I do not."; *and* Auto-Owners 30(b)(6) 78:4-11.

*a. The Crews Report.*

On September 26, 2023, less than a month after the loss, and a few days after Auto-Owners' final visit to the Property, the Smiths furnished Auto-Owners with the Crews Report. Randy Crews had been engaged by the Smiths on the advice of their contractor, Rusty Trancygier. As Mr. Trancygier

would explain to Auto-Owners in a letter dated October 30, 2023, he had observed conditions at the residence that concerned him and that prompted a request for engineering support:

> I first visited 2811 Pebblewood Drive 4 days after Hurricane Idalia. I noticed several doors and window headers that were out of square on the residence. I started checking the framed floor system and it had shifted on the block foundation. I suggested to the homeowner that he should contact a structural engineer for evaluation. [Exhibit B.]

Mr. Crews conducted that evaluation, with his report containing the following finding:

> The combination of the design level wind speeds (recorded gusts in Lowndes County in excess of 90 mph) along with the force from the tree impact caused severe localized damage at the north side of the structure and caused partial failure of the lateral force resisting system thereby causing the structure to rack. Racking refers to the structure being pushed out of square/out of level due to loading exceeding the capacity and ductility of the lateral force resisting system. [Doc. 19-1, p.2]

The Crews Report further notes the presence of "vertical distortion along cracks in the interior gypsum wall board and cracks/gaps in corner joints of trim around wall openings," and states that the home's "first floor walls were found to be out of plumb/level at various amounts from 1/8" over two feet to 3/8" over two feet." [Id., p.3.] The Crews Report states that racking was found "to exist at the front southwest corner of the structure (opposite side from where the larger tree impacted the structure)." In other words, the Crews Report found racking throughout the home.

The Crews Report explained that the following labor-intensive work would be necessary to re-square the house (i.e., to correct the racking):

> Repairs to a wall sheathing lateral force resisting system requires that the exterior wall finish and exterior doors and windows be removed along with substantial portions, if not all, of the exterior sheathing to allow the structure to be re-squared and leveled (plumbed). After re-squaring and plumbing the structure, new sheathing may be installed using proper methods and fastening to provide a repaired lateral force resisting system. Upon completion of this work, exterior windows, doors and exterior finish system may be re-installed to restore the structure to its pre-damaged condition. [Id.]

It further stated as follows:

> It should be noted that due to higher labor requirements to perform this type of selective work, particularly with the damage to the lateral force resisting system, often exceeds the cost of mass/ bulk demolition and re-construction. [Id.]

Auto-Owners refused to obtain any cost estimates to perform the work prescribed by Randy Crews, and it refused to conduct any further inspections.

*b. Auto-Owners' Misrepresentations of the Crews Report.*

Auto-Owners falsely claims that Randy Crews was retained by the Smiths to "refute" the conclusions of Auto-Owners' engineer, Brent Boyd. [Doc. 18-1, p.9.] This statement is inexplicable, as Auto-Owners is well aware that the Smiths retained Randy Crews mere days after the storm loss, long before the Smiths had seen the opinions of Brent Boyd.[2] As noted above, he was engaged, not for purposes of litigation or to rebut any other expert, but because their contractor advised it. His first inspection pre-dates Brent Boyd's lone site visit, and, at the time he generated his report, neither he nor the Smiths had seen the Trinity Report.

This is far from the only misrepresentation made by Auto-Owners. Auto-Owners claims that in its Brief that Mr. Crews conducted just one inspection which "lasted less than an hour." [Doc. 18-1, p.5-6.] This is simply false. Mr. Crews went to the property, not once, as Auto-Owners alleges, but twice, first on September 8, 2023, for an inspection lasting 1.5 hours [Doc. 32, Crews Depo. 73:20-21], then again on September 24, 2023, for a four-hour inspection [Id. 73:25-74:10.] He then spent six hours on September 25 drafting his report. [Id. 106:14-21.] Auto-Owners claims that "[h]e only evaluated the plumbness of two walls of the Property," that "it is completely undeterminable from Crews' report what portions of the Property Crews contends was racked", and that "[c]ertainly, there is no documentation that he ever inspected the interior of the Property." [Doc. 18-1, p.6] These statements are all untrue. As illustrated above, the Crews Report is very clear that its opinions applied to the entirety of the house. Auto-Owners has previously admitted this:

> Q. Well, so would -- does Auto-Owners agree that the Crews report stated that the racking occurred throughout the home?

---

[2] Per Auto-Owners' records, the Smiths were not given the opinions of Brent Boyd until November 15. [Ex. C, Claims Note, p.22.] The Smiths have no record of receiving the reports even then, but the point remains: Randy Crews opinions were obtained independently, earlier, and for different reasons than Auto-Owners has argued.

A. Yes, sir, it does.

Mr. Crews also unequivocally testified that his opinions applied to the whole structure: "I found plumbness issues being out of level just basically all around the house." [Id. 93:22-23.] Regarding the allegation that there is no documentation that he inspected the home's interior, the Crews Report itself contains this very documentation: "Services performed included site visit observations of the building exterior, **interior, attic & crawl space** and preparation of this report/letter" and "[a]dditional evidence of racking observed including vertical distortion along cracks in the **interior** gypsum wall board." [Emphasis added.] Moreover, even if he had not inspected the interior, Auto-Owners fails to explain why an engineer's finding that a home's exterior walls are racked would not require an equally, if not more, serious response than a finding related to interior plumbness.

To the extent that Auto-Owners found some aspect of the Crews Report unclear, ambiguous, or incomplete, they could have requested more information or scheduled a meeting or call with Randy Crews. No one at Auto-Owners ever sought to do this, nor did they attempt to connect him with their own engineer. [Crews Depo. 121:5-12, 122:2-8.] Grayson Smith repeatedly asked Auto-Owners to participate in a phone conference with Mr. Crews [Ex. C, pages 21-22], but Auto-Owners declined.

Auto-Owners characterizes Randy Crews' findings as "a short summation of his guess regarding the extent of the damage to the Property" and as offering "no additional information which would cause Auto-Owners to question its coverage decision." [Doc. 18-1, p. 18-19.] The fact that, even now, Auto-Owners would characterize the professional opinions of Randy Crews as "a guess" and would deny that they raised important questions as to the scope of coverage is a key marker of the intellectual dishonesty and obdurateness that lies at the heart of the bad faith claim. The point is not, and has never been, that the Crews Report was so manifestly definitive that Auto-Owners was not entitled to investigate further. The point is that the Crews Report is a credible document from a well-credentialed source containing significant findings. As such, it demanded meaningful action and

critical attention that Auto-Owners refused to give it.

*c. Response of Auto-Owners to the Crews Report.*

Auto-Owners sat on the Crews Report for nearly five weeks, waiting until November 1 to send it to Trinity Engineering. [Exhibit D.] No review or evaluation took place during the interim:

> Q. And during that, you know, month or more time period that lapsed, was anything done by Auto-Owners with the Crews Engineering report?
> A. Not to my knowledge. [Brumer Depo. 25:24-26:6.]

Meanwhile, the Smiths continued to be held in limbo, living in a rental house with two small children and unable to begin work at their home. Auto-Owners' Claims Notes reflect multiple conversations and communications with Auto-Owners about the claim during those five weeks [Exhibit C, p.26-33], but at no time did Auto-Owners inform the Smiths that evaluation of the Crews Report had not begun. Later, on November 8, 2023, Grayson Smith emailed Auto-Owners asking "[i]s there any word from engineering firm?" and asking Auto-Owners to please check with Trinity for a status update. Rather the confessing that Auto-Owners itself was the cause of the delay, Kip McKee of Auto-Owners responded cagily that "it may be weeks before we hear back" and "it seems like they, the engineering firm we retained, Trinity, are in the process of reviewing your engineer's report." [Exhibit D.]

Not surprisingly, Brent Boyd was not eager to admit that he had missed anything important during his site visit, nor did he volunteer to drive back from North Carolina to Valdosta for a single inspection. Given his compensation structure, which incentivizes volume, he would lose money if he allocated that much time to a single inspection [Boyd Depo. 68:15-17.] He did not call Randy Crews or otherwise submit inquiries. He spent just two hours reading and responding to the Crews Report. [Id. 56:8-13.] The short letter he wrote concludes as follows: "The photos from the subsequent reports **do not conclusively show** any additional damage that was not noted in the initial report by Trinity Engineering." [Doc. 19-7][Emphasis Added.] In other words, Mr. Boyd did not claim to have disproved Randy Crews' conclusions or to have identified any flaws or errors in it. As Auto-Owner's

30(b)(6) designee explained, "I don't believe he said [the Crews Report] was insufficient. It just didn't -- did not change his mind." [38:20-21.]

Brent Boyd is a very young engineer whose professional experience is almost exclusively limited to inspecting wind and hale damage to roofs. Auto-Owners boasts that his report was 73 pages long and "peer-reviewed" [Doc. 18-1, p.5], but 67 of those pages consist of photos, and "peer-reviewed" merely means his supervisor at Trinity, about whom we know nothing other than his name, looked over it.[3] [Boyd Depo. 24:15-25:8.] Mr. Boyd spent just 90 minutes on site to perform his inspection. [Boyd Depo. 19:6-9.] Given his self-imposed time constraints and broad mission, there is no reason to think he would have observed, documented, or even considered a more latent issue or problem. He specifically told the Smiths that he was not there to get into the "nitty gritty." [Doc. 22, G. Smith 74:5-7; Ex. E] Incredibly, no one at Auto-Owners met or spoke with Brent Boyd a single time about the Smiths' claim, nor did anyone contact him by email. [Brumer Depo. 20:1-18.] Dan Waller testified that he did he not speak with Mr. Boyd, he did not read his report, and, in fact, in the last 25 years, he has not spoken to any engineer regarding their report. [Waller Depo. 26:6-11, 33:12-13.] Cliff Williamson, who took over the Smiths' claim in June 2024, testified regarding the Trinity Report, "I glanced through it once when the claim was reassigned to me." [30(b)(6) 45:16-18.]

In sum, Brent Boyd was a wholly unknown person to the decisionmakers at Auto-Owners with unidentified qualifications who generated opinions that almost no one read and absolutely no one discussed. Auto-Owners has staked the validity of its denial of coverage for racking entirely on these opinions, yet it is plain that any reliance on them was both blindly placed and wholly misplaced.

*d. Auto-Owners' Refusals to Investigate Further.*

Following delivery of the Crews Report, both the Smiths repeatedly asked Auto-Owners to

[3] It is interesting, however, that Auto-Owners would impliedly tout the virtues of peer review in a case where it has been so adamant in its refusal to obtain a second opinion.

reinspect the house. [30(b)(6) 61:2-8; 63:10-15; Ex. E] These requests were flat out rejected:

> I remember, I'm pretty sure it was a phone conversation with Grayson. I told him we weren't going to reinspect the property. He had asked several times, and I told him no. [Brumer Depo. 49:16-19.]

The Smiths also repeatedly requested that Auto-Owners participate in a phone call with Randy Crews and Rusty Trancygier to discuss their findings and recommendations [Ex. C, Claims Notes, p.21-22.] Auto-Owners would not do that either.

Having made no progress with Auto-Owners, the Smiths engaged the undersigned counsel who, on January 11, 2024, sent a demand letter to Auto-Owners under O.C.GA. 33-4-6. [Doc. 1-2, Ex. J.] Auto-Owners responded on January 25, 2024 [Doc. 1-2, Ex. K.], stating that "[a]s we stated in our letter of December 18, 2023 to our insured, we are not in agreement with the amount claimed on the Proof of Loss form" and "we do believe that we have appropriately paid the actual cash value of the incurred damages as it related to the storm event on or around August 30, 2023."

Thereafter, counsel for the Smiths twice encouraged Auto-Owners in writing to return to the Property, if not to reconsider its coverage decision, at least to obtain any further measurements it might want for its file, as the Smiths intended to begin demolition work. On February 6, 2024, counsel for the Smiths wrote: "I am asking that Auto-Owners reconsider its decision not to investigate further and that it send either Mr. Boyd or some other person whom it deems qualified to assess Mr. Crews' findings." [Doc. 1-2, Ex. L.] On February 12, 2024, Auto-Owners responded, "[a]t this time our position in regards to the claim remains the same." [Id., Ex. M.] Shortly thereafter, on February 22, 2024, counsel for the Smiths sent another letter to Auto-Owners [Id., Ex. N] stating in part:

> You did not respond to my invitation to schedule one or more visits to the property for the purpose of obtaining photographs or measurements or to conduct further investigations in preparation for the above-mentioned litigation. I am interpreting that as meaning that Auto-Owners does not wish to revisit the property for any of those reasons and that it does not take any issue with my client's timeline for beginning construction work. If I am mistaken, please let me know as soon as possible so that arrangements can be made to accommodate any requested site visits before work begins.

Auto-Owners did not accept the invitation to reinspect the Smiths' house, nor did it otherwise respond to the letter. At no time did it object to the Smiths' plans to demolish the home.

*e.* *Quest Engineering Report*.

Because Auto-Owners would never return to the Smiths' house for further measurements, the Smiths eventually undertook this work for themselves. This was not something that Auto-Owners had requested or required. Rather, it was simply a decision made by the Smiths to further confirm the existence of racking and to document its scope prior to construction. The end result was the Quest Report, which the Smiths sent to Auto-Owners on May 10, 2024 [Doc. 2-1, Ex. P]. The Quest Report contains the following conclusion: "In our opinion, the impact from the trees not only directly fractured and compromised many structural members, but also shifted and permanently displaced 90% of the structure." It further explained that the shift to the homes walls exceeded levels attributable to reasonable construction tolerances, the amount of shifting at different locations was proportional to the distance from the point of tree impact, and the direction and pattern of the shifting in various locations was consistent with having been caused by the tree impact. These conclusions are supported by two diagrams, 26 pictures showing various wall measurements, and a thorough written discussion of Quest's methods and determinations. [Doc. 19-2.]

At that point, the Smiths had already sent Auto-Owners a statutory demand under O.C.G.A. § 33-4-6 back in January, but, in a good faith effort to resolve the dispute, the Smiths offered Auto-Owners another 60 days to consider the Quest Report and to reevaluate its coverage decision. This gesture was in vain, however, as the report barely registered a yawn from Auto-Owners. Auto-Owners did not forward it to its retained engineer or to any other person for review or consultation. Auto-Owners did not ask to speak with Quest Engineering about its findings. The only person at Auto-Owners who even bothered to read it was Timothy Brumer, the most junior staff person working on the claim. [30(b)(6) 57:13-58:3.] Auto-Owners never replied to the Smiths in any way, or took any

other action. Auto-Owners simply ignored it.

> Q. And after receiving the Quest Engineering report, was anything done to reconsider this claim, evaluate it further, obtain more information?
> A. Not to my knowledge. [Brumer Depo. 38:18-21.]

Auto-Owners claims that it ignored the Quest Report because the house had already been razed. The implication is that the Quest Report could not be evaluated absent a site visit, but that is plainly untrue. The Quest Report is detailed, thorough, and premised on objective measurements taken by a licensed engineer. As such, it can considered without any need to be on site. If Auto-Owners had truly wanted its own data, it could have obtained it at any time over a period of months, but it repeatedly refused to return to the Property despite being told the house would be torn down [30(b)(6) 101:5-8]:

> Q. But Auto-Owners understands, I assume, that it received multiple notices that the Smiths intended to demo the home months before it actually occurred, correct?
> A. Yes, sir.

And perhaps most importantly, Auto-Owners has admitted that there is no data in the Quest Report that Auto-Owners could not have obtained for itself in the months prior to demolition:

> Q. What I'm asking you is, is Auto-Owners -- has it identified anything in the Quest Engineering report, any measurements that were taken, any photographs that were taken, anything that it could not have obtained for itself prior to the home being demoed?
> A. To my knowledge, no, sir. [Auto-Owners 30(b)6) 102:9-14.]

Auto-Owners has also admitted that the Quest Report contains credible information validating the Smiths' longstanding request for a reinspection: "Given this information, Auto-Owners would have reinspected the Property. (Id., 100:13-20)." [*See also* 90:5-8; Doc. 18-2, ¶50.] Embedded in this admission is crucial insight into Auto-Owners' bad faith. Auto-Owners acknowledges that the Quest Report contains significant and relevant findings, all of which Auto-Owners could have obtained for itself at any time. Auto-Owners has not adduced any evidence that the Quest Report is flawed in any way. The problem, then, is not that the house was razed, which is something Auto-Owners knew would occur. The problem is that Auto-Owners had long since etched its coverage decision in stone,

and any arguments that it was entitled to further opportunities to investigate the racking, or that it would have taken advantage of such opportunities, are both baseless and hollow.

*f. Auto-Owner's Dishonest Arguments Regarding Reliance on Keith O'Donnell*

Perhaps the most surprising aspect of Auto-Owner's Brief is the extent to which it falsely claims that its coverage decision was based on the opinions of Keith O'Donnell. The brazenness of such an argument is staggering, as the evidence very clearly shows that Auto-Owners did not rely on Keith O'Donnell at all. Dan Waller testified as follows:

> Q. Did you or anyone else at Auto-Owners ever ask J.S. Held are y'all able to determine if racking occurred?
> A. I am not aware of that. They are a building consultant. We did not use them as an engineering capacity. [Waller 47:12-13]

Similarly, Tim Brumer testified "I do not recall having any conversation or e-mail with Keith O'Donnell where I mentioned racking, no." [Brumer 32:12-13.] He further identified racking as a question for an engineer, and Mr. O'Donnell is not an engineer [Id. 13:1-4]:

> Q. Are you trained in any way to actually look for racking to, you know, do --
> A. I'm not trained to look for damage that an engineer would look for, no.

When explaining Auto-Owner's decision not to reinspect the Property after receipt of the Crews Report, Mr. Brumer did not identify Keith O'Donnell's opinions or report as factoring into that decision at all, He referred only to Brent Boyd's November 3 letter: "We had made a determination not to reinspect based on the fact that we had shared the engineer report from the insured with our engineer, who found no reason to reinspect the property." [Id. 52:4-7.]

Keith O'Donnell did not review the Crews Report or the Quest Report until a few days before his deposition. [O'Donnell Depo. 33:21-24:20.] No one from Auto-Owners ever asked him if the house was out of plumb or racked [Id., 69:1-3] and no one at Auto-Owners ever asked him what he observed or what his opinions may have been concerning plumbness or racking [Id. 32:14-20.] In fact, he never spoke to anyone at Auto-Owners about the Smiths' claim at all:

Q. Do you recall speaking to anyone by phone or meeting with anyone in person with Auto-Owners about the Smiths' claim?
A. No. [Id., 54:2-4]

The opinions cited by Auto-Owners in its brief were offered by Keith O'Donnell, not during the adjustment of the claim, but for the very first time in his deposition. His report contains absolutely no discussion of racking or plumbness, and, as noted above, Auto-Owners never spoke with him about that topic. In his deposition, he prefaced his opinions as follows: "Okay. If asked about my opinion, I'll give it, but I don't have a engineer's degree behind me." [Id. 32:9-10.] So when Auto-Owners tells the Court in its Brief that "Mr. O'Donnell opined that based on his training and extensive professional experience in construction, the Property was not "racked," or otherwise out of plumb, due to the tree impact as alleged by the Plaintiffs in this matter," they mean that he offered this opinion in his deposition. And, as Auto-Owners well knows, it is being crafty with the wording of that statement, as Mr. O'Donnell actually did opine that the house was out of plumb – only for reasons other than the tree impact. This was rather shocking testimony which Auto-Owners is conspicuously careful not to disclose to this Court despite it having the utmost relevance.

By opining that the house is out of plumb, Keith O'Donnell positioned himself directly at odds with Auto-Owner's engineer. After all, Brent Boyd's position is that the house was plumb. Keith O'Donnell fully agrees with the Smiths' engineers that the house is not square, and he accepts the Quest Report's measurements ("I think they're accurate"). He simply thinks the house was built that way. [Id. 47:24-48:1, 64:18-65: 4, 65:24-25.] This does not strike him as a bombshell conclusion, though, as does not believe that homes actually need to be built with straight walls [Id. 48:2-7]:

Q. And if a house is built out of square, does that create any problems for the homeowner?
A. No.
Q. Then why are houses built -- you know, why is the standard to build your house plumb?
A. Have to start some place.

The qualitative distance between Keith O'Donnell's opinion and Brent Boyd's is vast and

irreconcilable. Embedded in that chasm is the very essence of Auto-Owners' bad faith: Auto-Owners did not know that its two consultants held such differing views, as it had never spoken to either of them about the issue, and it lacked the forthrightness to disclose this irresolvable conflict to the Court. While it is obvious that Auto-Owners did not actually rely on Keith O'Donnell to the extent it claims, if it had, that would only further undermine their unfounded refusal to provide coverage for racking.

C. AUTO-OWNERS' ARGUMENTS REGARDING PROCEDURAL DEFICIENCY.

Auto-Owners claims that, pursuant to the terms of the Policy, it had 60 days to review the Quest Report before the claim became payable. [Doc. 18-1, p. 14.] This is untrue, as shown by the very Policy language that Auto-Owners quotes. Section I, Subsection 6(f) of the Policy states that, for insurable losses to the house, Auto-Owners will issue payment as follows:

> We will pay within 60 days **after we receive your proof of loss and all other requested documents** and the amount of loss is finally determined by an agreement between you and us, a court judgment or an appraisal award. [Emphasis added.]

Payment is thus conditioned on receipt of two things: a proof of loss and "all other requested documents." It is undisputed that the Smiths submitted their sworn statement in proof of loss to Auto-Owners on December 7, 2023. Auto-Owners fully acknowledged this in a letter dated December 20, 2023 [Doc. 1-2, Ex. I] stating (i) "[w]e received the notarized Sworn Statement in Proof of Loss" and "you have complied with the policy condition to submit a Proof of Loss."

The only other condition, then, is the submission of "other requested documents." Auto-Owners argues that the Quest Report falls in this category, stating that "Plaintiff's claim was not payable until at least July 10, 2024, sixty days after Plaintiffs submitted the Quest Engineering report to Auto-Owners for the first time." [Doc 18-1, p.14.] That argument is both false and unsupported. The Quest Report would only trigger a 60-day review period under the Policy if it was something that Auto-Owners had actually requested. But the Smiths were neither required by the Policy to obtain a second engineering opinion, nor did Auto-Owners ask them to do so. The following testimony makes

this very clear [30(b)(6) 70:24-71:13]:

> Q. Okay. But I'm asking, did y'all ever tell them, we're going to need a more detailed report to consider a second inspection?
> A. I mean, there's nothing -- there's nothing in the file to indicate that that specific conversation was had.
> Q. Okay. Does Auto-Owners believe that that conversation was had?
> A. There's nothing in the file to support that it was.
> Q. I'm asking -- but you're saying what's in the file. I'm asking, you know, is there some reason to believe that it happened, despite the fact that it's not documented in the file?
> A. No, sir. But there would've been multiple requests for any documentation or any other documentation that they could have provided.

Auto-Owners is plainly advancing an interpretation that does not match the Policy language. In its 30(b)(6) deposition, Auto-Owners stated "we have 60 days to review any documentation that is provided to us, per the policy." [30(b)(6) 103:3-4.] That is not what the Policy says. Unless Auto-Owners can show that the Quest Report had specifically been "requested" (and that the Policy authorizes Auto-Owners to request engineering reports from its insured), it cannot claim entitlement to a 60-day review period. In its brief, Auto-Owners does not make any claim to have "requested" the Quest Engineering Report, nor could it. The Quest Report is something the Smiths had obtained entirely voluntarily in the hopes of resolving this matter (and, failing that, to preserve important data for future use). The Smiths' claim had been payable since the 60-day time period had run following delivery of their Proof of loss, and their delivery of a second engineering report did not restart the contractual clock. Auto-Owners' response to that report – more appropriately, its lack thereof – does, however, deepen the hole of bad faith in which it already stood.

It should also be noted that Auto-Owner's 30(b)(6) designee testified "[t]ypically, we don't agree with reinspections." [Id. 107:16-17.] Given this statement, and given Auto-Owners' persistent course of conduct in this case, it rings hollow for Auto-Owners to meekly theorize, "had it been immediately received by us, you know, we might've said, hey, let's let us inspect this; however, you know -- or, hey, we'll give the reinspection." [30(b)(6) 101:17-19.] The Quest Report represented a

golden opportunity for Auto-Owners to reverse course and address this claim thoughtfully. Rather than do so, however, Auto-Owners discarded it out of hand, as it fully admits [Id., 57:13 - 58:4]:

> Q. So how did Auto-Owners undertake to evaluate the statements and the findings contained in this Quest Engineering report?
> A. I believe at that point, it was -- it was just reviewed, but there was nothing -- once again, I'm not sure what was done with it. At that point -- I'm not sure what was done with the report at that time. Like I said, I do know – I do know we reviewed it, but, once again, at that point, the house -- the house was razed.
> Q. And who reviewed it for Auto-Owners?
> A. It would have been Tim Brumer.
> Q. Anyone else?
> A. No, sir. Not that I'm aware of.
> Q. Okay. Were there ever any meetings convened by Auto-Owners to discuss the Quest Engineering report?
> A. Not to my knowledge.

The suggestion that Auto-Owners was entitled to more time with which to do absolutely nothing with the Quest Report is not just at odds with the Policy, it borders on being satire.

## III. CONCLUSION

The Smiths' repeated efforts to have Auto-Owners consider the racking with seriousness and good faith were met with a mixture of indifference and hostility. At nearly every turn, Auto-Owners treated the Smiths as nuisances to be tolerated or adversaries to be thwarted, not as human beings with a valid coverage issue deserving of serious treatment. Auto-Owners certainly never behaved as if the truth were their ultimate goal, only plausible deniability. Their adjustment of this claim was a mixture of hostility and inattentiveness, characterized by unwarranted skepticism of the Smiths' experts and blind trust of their own. It is frankly unfathomable that they would never return to the Smiths' home for an inspection after racking had been identified as an issue, or that they would not agree to speak to the Smiths' engineer or contractor about their findings and concerns. It is equally bizarre that they never even spoke with their own retained experts about it. Georgia law states that bad faith is generally a question for the jury, and, given the overwhelming evidence of bad faith set forth above, the Smiths are clearly entitled to present this claim at the trial of this case.

This 1st day of August 2025.

ELLIOTT BLACKBURN PC

JAMES R. MILLER
Georgia Bar No. 159080
Attorney for Plaintiffs

Of counsel:
3016 North Patterson Street
Valdosta, Georgia 31602
Telephone (229) 244-3333

**CERTIFICATE OF SERVICE**

This is to certify that I have this day served a true and correct copy of the foregoing **Plaintiffs' Brief In Response To Defendant's Motion For Partial Summary Judgment** upon the below listed persons by electronic mail addressed to:

**SWIFT, CURRIE, MCGHEE & HIERS, LLP**
Jessica M. Phillips
Brittney A. Sizemore
1420 Peachtree Street NE, Suite 800
Atlanta, Georgia 30309
jessica.phillips@swiftcurrie.com
brittney.sizemore@swiftcurrie.com

This 1st day of August, 2025.

ELLIOTT BLACKBURN PC

JAMES R. MILLER
Georgia Bar No. 159080
Attorney for Plaintiffs